**TERRY W. MACKEY, P.C.**
Terry W. Mackey
314 East 21st Street
Cheyenne, WY 82001
Telephone: (307) 635-7517
Facsimile: (307) 635-7565

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

APR 27 2011

Stephan Harris, Clerk
Cheyenne

**BARROWAY TOPAZ KESSLER**
  **MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Richard Kim
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| NORMAN M. SCHMITZ and STEVE R. DIEHL, Individually, On Behalf of All Others Similarly Situated, and Derivatively on Behalf of Nominal Defendant DUOYUAN PRINTING, INC., <br><br> Plaintiffs, <br><br> v. <br><br> XIQING DIAO, WENHUA GUO, BAIYUN SUN, CHRISTOPHER PATRICK HOLBERT, WILLIAM D. SUH, JAMES ZHANG, LIANJUN CAI, PUNAN XIE, SIK SIU KWAN, and CHUI MAN LUNG EVERETT, <br><br> Defendants, <br><br> and <br><br> DUOYUAN PRINTING, INC., <br><br> Nominal Defendant. | Case No. _11-CV-157-F_ <br><br> **VERIFIED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Norman M. Schmitz and Steve R. Diehl (collectively, "Plaintiffs"), by the undersigned attorneys, submit this Verified Class Action and Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## INTRODUCTION

1.     Plaintiffs bring this action individually, on behalf of a class of shareholders (the "Class," as defined herein) of Duoyuan Printing, Inc. ("Duoyuan" or the "Company") and derivatively for the benefit of Duoyuan against the members of Duoyuan's Board of Directors ("Board") and certain of its current and former officers and directors (the "Individual Defendants," as defined herein) seeking to remedy defendants' breaches of fiduciary duties and other violations of law in connection with the issuance of false and misleading statements concerning the Company's earnings and expenses;  willfully ignoring obvious and pervasive problems with the Company's accounting practices and lack of adequate internal financial controls, specifically with respect to certain of the Company's expenses related to advertising and tradeshow costs and improper relationships with certain vendors and distributors; failing to make a good faith effort to correct these problems and/or prevent their recurrence; and failing to hold an annual meeting of shareholders as required by law.

## NATURE OF THE ACTION

2.     Duoyuan, a producer of commercial offset printing presses in China, became a public company pursuant to an initial public offering ("IPO") on the New York Stock Exchange on November 6, 2009.

3.     For Duoyuan's entire existence as a public company the Individual Defendants have knowingly misrepresented the Company's financial performance and have knowingly maintained inadequate internal controls.

4.      The Individual Defendants' house of cards fell on September 13, 2010, when the Company announced that its CEO, CFO, and several Board members had suddenly resigned and the Audit Committee had dismissed Deloitte Touche Tohmatsu CPA Ltd. ("Deloitte") as the Company's independent auditor after Deloitte had raised issues regarding the accuracy of the Company's financial statements and the integrity of management.

5.      In the ensuing six months, the Company has still not retained a new independent auditor, has not filed any financial statements with the Securities and Exchange Commission ("SEC"), and has not held an annual meeting of shareholders. The Company has, however, become the subject of a formal investigation by the SEC.

6.      In breach of their fiduciary duties to the Company, the Individual Defendants knowingly engaged in improper financial reporting and accounting practices, disseminated false and misleading financial statements in violation of SEC regulations and Generally Accepted Accounting Principles ("GAAP"), and knowingly maintained inadequate internal controls, a direct and proximate result of which the Company has sustained significant damages.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful

-3-

acts detailed herein, occurred in this district. One or more of the defendants directed numerous activities and conducted business here, which had an effect in this District.

## PARTIES

9.      Plaintiff Schmitz is a shareholder of nominal defendant Duoyuan, was a shareholder of Duoyuan at the time of the wrongdoing alleged herein, and has been a shareholder of Duoyuan continuously since that time. Plaintiff Schmitz is a citizen of the State of Missouri.

10.      Plaintiff Diehl is a shareholder of nominal defendant Duoyuan, was a shareholder of Duoyuan at the time of the wrongdoing alleged herein, and has been a shareholder of Duoyuan continuously since that time. Plaintiff Diehl is a citizen of the State of Colorado.

11.      Nominal defendant Duoyuan is a Wyoming corporation with its principal place of business located at No. 3 Jinyuan Road, Daxing Industrial Development Zone, Beijing, People's Republic of China 102600. According to its public filings, Duoyuan is an offset printing equipment supplier in China, headquartered in Beijing.

12.      Defendant Xiqing Diao ("Diao") has served as the Company's Chief Executive Officer ("CEO") since September 8, 2010, and prior to that he served as interim CEO from July 9, 2009 to August 26, 2009. Diao also served as a director of the Company from November 2005 until his resignation on September 6, 2010. Upon information and belief, Diao is a citizen of China.

13.      Defendant Wenhua Guo ("Guo") has served as Chairman of the Board at all times relevant hereto and previously served as CEO of the Company from October 6, 2006 to June 29, 2009. Upon information and belief, Guo is a citizen of China.

14.      Defendant Baiyun Sun ("Sun") has served as the Company's Chief Financial Officer ("CFO") since September 8, 2010, and prior to that she served as CFO from October 6,

2006 to July 18, 2007, December 20, 2007 to March 1, 2008, and May 21, 2008 to October 1, 2008. Sun also served as the director and Vice President of the Company between June 2001 to April 2007. Upon information and belief, Sun is a citizen of China.

15.    Defendant Christopher Patrick Holbert ("Holbert") served as the Company's CEO from August 2009 until his resignation in September 8, 2010. Holbert also served as a member of the Company's Board, as Chairman of the Audit Committee, and as a member of the Company's Compensation and Nominating and Corporate Governance Committees, from July 2007 to August 2009. Holbert now serves as Vice President of International Markets of the Company. Upon information and belief, Holbert is a citizen of China.

16.    Defendant William D. Suh ("Suh") served as the Company's CFO from October 8, 2008 until his resignation on September 6, 2010. Upon information and belief, Suh is a citizen of China.

17.    Defendant James Zhang ("Zhang") served as a director of the Company and as Chairman of the Audit Committee from September 2009 until his resignation on September 6, 2010. Upon information and belief, Zhang is a citizen of China.

18.    Defendant Lianjun Cai ("Cai") has served as a director of the Company and as Chairman of Compensation Committee since April 2007, and he has also served on the Audit Committee at various relevant times. Cai was most recently elected Chairman of the Audit Committee on September 8, 2010. Upon information and belief, Cai is a citizen of China.

19.    Defendant Punan Xie ("Xie") has served as a director of the Company and as Chairman of the Nominating and Corporate Governance Committee since April 2007, and he has also served on the Audit Committee at various relevant times. Upon information and belief, Xie is a citizen of China.

20.     Collectively, defendants Diao, Guo, Sun, Holbert, Suh, Zhang, Cai and Xie are referred to herein as the "Individual Defendants."

21.     Defendant Sik Siu Kwan ("Sik") has served as a director of the Company since September 26, 2010.  Upon information and belief, Sik is a citizen of Hong Kong.

22.     Defendant Chui Man Lung Everett ("Chui") has served as a director of the Company since November 26, 2010.  Upon information and belief, Chui is a citizen of China.

23.     Collectively, defendants Guo, Cai, Xie, Sik, and Chui are referred to herein as the "Director Defendants."

## DUTIES OF INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

26.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.      exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

      b.      exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

      c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

      d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

      e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

27.     The Individual Defendants, as senior executives and as members of the Board, were responsible for maintaining and establishing adequate internal accounting controls for the Company, and to ensure that the Company's financial and operational statements were based on accurate financial and operational information, and were not presented in a misleading manner. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

      a.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

      b.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

            i.      transactions are executed in accordance with management's general or specific authorization; and

            ii.      transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

28.      Furthermore, the members of the Company's Audit Committee must comply with the obligations set forth in the Audit Committee Charter (the "Charter"). According to the Charter, the purpose of the Audit Committee is "to oversee the accounting and financial reporting processes of the Company and audits of its financial statement and the effectiveness of the Company's internal control over financial reporting."

29.      In fulfillment of these obligations, the Audit Committee maintains the following responsibilities:

- Appoint and provide for the compensation of an independent registered public accounting firm to serve as the Company's independent auditor, oversee the work of the independent auditor (including resolution of any disagreements between management and the independent auditor regarding financial reporting), evaluate the performance of the independent auditor and, if so determined by the Committee, replace the independent auditor; it being acknowledged that the independent auditor is ultimately accountable to the Board and the Committee, as representatives of the stockholders;

- Ensure the receipt of, and evaluate the written disclosures and the letter that the independent auditor submits to the Committee regarding the auditor's independence in accordance with Independence Standards Board Standard No. 1, discuss such reports with the auditor, oversee the independence of the independent auditor and, if so determined by the Committee in response to such reports, take appropriate action to address issues raised by such evaluation;

- Discuss with the independent auditor the matters required to be discussed by SAS 61, as it may be modified or supplemented;

- Instruct management, the independent auditor and the internal auditor (if any) that the Committee expects to be informed if there are any subjects that require special attention or if any significant deficiencies or material weaknesses to the system of internal control over financial reporting are identified. Review with management and the independent auditor any material changes to the system of internal control over financial reporting;

- Instruct the independent auditor to report to the Committee on all critical accounting policies of the Company, all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor, and other material written communication between the independent auditor and management, and discuss these matters with the independent auditor and management;

- Meet with management and the independent auditor, together and separately, to discuss the annual financial statements and the report of the independent auditor thereon, and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; the adequacy of internal controls, and the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC; and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the Regulations) included in any report filed with the SEC or in any public disclosure or release;

- Review and discuss with management and the independent auditor management's report on internal control over financial reporting, and the independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, prior to the filing of the Form 10-K;

- Review the management letter delivered by the independent auditor in connection with the audit;

- Following such review and discussions, if so determined by the Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K;

- Meet quarterly with management and the independent auditor to discuss the quarterly financial statements prior to the filing of the Form 10-Q; provided that this responsibility may be delegated to the chairman of the Committee or a member of the Committee who is a financial expert;

- Meet at least once each year in separate executive sessions with management, the internal auditor, if any, and the independent auditor to

discuss matters that any of them or the Committee believes could significantly affect the financial statements and should be discussed privately;

- Have such direct and independent interaction with members of management, including the Company's chief financial officer and chief accounting officer, as the Committee believes appropriate;

- Review significant changes to the Company's accounting principles and practices proposed by the independent auditor, the internal auditor, if any, or management;

- Review the scope and results of internal audits, if any;

- Evaluate the performance of the internal auditor, if any, and, if so determined by the Committee, recommend replacement of the internal auditor;

- If there is an internal auditor, obtain and review periodic reports on the internal auditor's significant recommendations to management and management's responses;

- Conduct or authorize such inquiries into matters within the Committee's scope of responsibility as the Committee deems appropriate;

- Provide minutes of Committee meetings to the Board, and report to the Board on any significant matters arising from the Committee's work;

- At least annually, review and reassess this Charter and, if appropriate, recommend changes to the Board;

- Prepare the Committee report required by the Regulations to be included in the Company's annual proxy statement;

- Establish a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- Approve, in accordance with Sections 10A(h) and (i) of the Exchange Act, the Regulations and the Auditing Standards of the Public Company Accounting Oversight Board, all professional services, to be provided to the Company by its independent auditor, provided that the Committee shall not approve any non-audit services proscribed by Section 10A(g) of the Exchange Act in the absence of an applicable exemption. The Committee may adopt policies and procedures for the approval of such

services which may include delegation of authority to a designated member or members of the Committee to approve such services so long as any such approvals are disclosed to the full Committee at its next scheduled meeting;

- Review and approve all related party transactions.

## SUBSTANTIVE ALLEGATIONS

30. In its Registration Statement filed in connection with the Company's IPO,

Duoyuan claimed to be a remarkably successful and growing company. According to the

Registration Statement:

> Our revenue grew 32.2% from $67.8 million in the year ended June 30, 2007 to $89.6 million in the year ended June 30, 2008 and 18.9% to $106.6 million in the year ended June 30, 2009. Our net income grew 89.3% from $14.0 million in fiscal 2007 to $26.5 million in fiscal 2008 and 23.2% to $32.6 million in fiscal 2009.

\* \* \*

> Our selling expenses consist primarily of employee subsidies and benefits for our sales and marketing staff, transportation costs and marketing, sales, advertising, travel and entertainment activities expenses. Our selling expenses were $7.8 million, $8.7 million and $9.7 million for fiscal 2007, 2008 and 2009, respectively.

\* \* \*

> Because we sell all of our products to distributors, our selling expenses as a percentage of revenue are significantly lower than manufacturers that primarily sell directly to end-user customers. While we intend to continue to sell our products exclusively to distributors, we plan to build our brand recognition through increased marketing activities both inside and outside of China, which may increase our sales and marketing expenses in terms of actual amounts, as well as a percentage of revenue. In the near term, we expect that certain components of our selling expenses will increase as we continue to build brand recognition through increased marketing activities both inside and outside of China. Specifically, we expect that advertising expenses will increase as we increase our advertising in magazines and trade journals and expand into new forms of media, including online advertising. In addition, we anticipate that exhibition expenses will increase as we plan to participate in more trade shows and exhibitions all across China to develop and enhance our reputation in the printing and packaging industries. We also expect salary expenses to increase as we continue to hire additional sales representatives to help broaden our end user customer base. This anticipated increase in selling expenses will be a

> direct result of our plan to grow, strengthen and support our nationwide distribution network.
>
> * * *
>
> Our nationwide distribution network in China consists of over 85 distributors located in over 65 cities and 28 provinces in China. Our nationwide distribution network, which we believe, based on our experience in the industry, to be one of the largest among Chinese offset printing equipment suppliers, enable us to be more responsive to local market demands than many of our competitors. We support our distributors' sales efforts through coordinated marketing efforts. We regularly attend industry trade shows and exhibitions to showcase our products, as well as present seminars and training programs to our potential and existing distributors, as well as potential and existing end-user customers, to highlight the functions and capacities of our products. To maintain good relationships with our end-user customers, we provide certain services during the one-year warranty period associated with our products. During this period, we provide training, technical support, warranty and repair services for complex technical issues to our distributors who work with our end-user customers.

31.     Following the IPO, Duoyuan continued to report outstanding financial results. On

February 10, 2010, the Company issued a press release announcing results for the second quarter

ended December 31, 2009, reporting revenue of $42.4 million, compared to $36.8 million for the

same period the prior year, and net income of $13.8 million, compared to net income of $12.5

million for the same period the prior year.

32.     On March 3, 2010, Duoyuan announced more (apparently) good news that it was

changing its independent auditor from the relatively small and little-known Frazer Frost, LLP to

Deloitte, an affiliate of a "Big 4" auditing firm.

33.     On May 10, 2010, Duoyuan announced further impressive financial results for the

third quarter ended March 31, 2010, reporting net revenues of $23.4 million, compared to $17.4

million for the same period the prior year, as well as net income of $7.3 million, compared to

$4.9 million for the same period the prior year.

34.     The Individual Defendants, however, knew that Duoyuan was not nearly the financial powerhouse it claimed to be because, in fact, the Individual Defendants had been manipulating Duoyuan's financial reporting and accounting to make the Company appear more successful than it actually was.

35.     The Individual Defendants knew that all of Duoyuan's publicly reported financial statements, including:

      a.     Duoyuan's Quarterly Report on Form 10-Q filed with the SEC on November 16, 2009, which was signed by  Holbert and Suh certifying that the financial information contained in the 10-Q was accurate;

      b.     A press release dated February 10, 2010 announcing the Company's financial results for the second fiscal quarter ended December 31, 2009;

      c.     Duoyuan's Quarterly Report on Form 10-Q filed with the SEC on February 11, 2010, which was signed by  Holbert and Suh certifying that the financial information contained in the 10-Q was accurate;

      d.     A press release dated May 10, 2010 announcing the Company's financial results for the third quarter ended March 31, 2010; and

      e.     Duoyuan's Quarterly Report on Form 10-Q filed with the SEC on May 11, 2010, which was signed by  Holbert and Suh certifying that the financial information contained in the 10-Q was accurate,

were false and misleading because the Individual Defendants had knowingly engaged in improper financial reporting and accounting practices as alleged herein, including, but not limited to, improperly reporting revenues, expenses, and net income.

36.     The Individual Defendants' façade came crashing down on September 13, 2010, when Duoyuan announced the resignations of CEO Holbert, CFO Suh, defendant Zhang, and directors Naoko Hatakeyama ("Hatakeyama") and Paula J. Dobriansky ("Dobriansky"), both of whom had joined the Board less than four months earlier, as well as the dismissal of Deloitte as

the Company's independent auditor. In a Form 8-K filed with the SEC on September 13, 2010,

Duoyuan reported:

> Effective as of September 6, 2010, Deloitte Touche Tohmatsu CPA Ltd. ("Deloitte") was dismissed by the Audit Committee (the "Audit Committee") of Duoyuan Printing, Inc. (the "Company") as the independent registered public accounting firm of the Company.

\* \* \*

> Deloitte requested that the Company provide permission to access original bank statements to complete its audit procedures to verify the identity of certain individuals and entities associated with third party distributors and vendors. As of the time of Deloitte's dismissal, the Company had not granted such permission because it believed the method and scope of the request was overly broad for the purpose of verifying the identity of such individuals and entities. Deloitte informed the Chairman of the Audit Committee of such disagreement and the matter was not resolved by the time of Deloitte's dismissal.

\* \* \*

> In the course of its audit procedures, *Deloitte identified supporting documentation for approximately RMB24 million of expenses related to advertising and tradeshow costs, the authenticity of which could not be verified to Deloitte's satisfaction.* Deloitte suggested to the Audit Committee that it investigate these expenses. The Audit Committee has undertaken an independent investigation. At the time of its dismissal, Deloitte had not received subsequent information from the Audit Committee on the progress or outcome of the investigation.

> In the course of its audit procedures, *Deloitte received information regarding certain distributors and vendors that appeared inconsistent with certain information that the Company had provided.* Deloitte informed the Company and the Audit Committee of the inconsistencies. The Company worked to address these inconsistencies, but at the time of its dismissal, Deloitte had not received complete explanations from the Company to address all of its concerns.

> *Deloitte advised the Audit Committee that it was informed by the Chief Executive Officer and Chief Financial Officer of the Company that they felt they did not have access to the information on the open matters referred to above nor were they in a position to assist the investigation. Deloitte expressed its concerns as to the impact of this on its ability to rely on the future representations from those members of management that it would otherwise seek to obtain as part of its normal audit procedures.*

\* \* \*

> On September 6, 2010, following the decision to dismiss Deloitte as the independent registered public accounting firm of the Company:

> Mr. James Zhang, Chairman of the Audit Committee tendered his resignation from the Board of Directors of the Company (the "Board")

-14-

effective immediately over the disagreement with the Company and the Board for dismissing Deloitte as the independent registered public accounting firm of the Company. Mr. Zhang had served as the Chairman of the Audit Committee and a member of the Board since September 2009. Mr. Zhang's resignation letter is included as Exhibit 99.2 to this Current Report; and

The Honorable Paula J. Dobriansky tendered her resignation from the Board effective immediately, which was later followed by a formal letter. The Honorable Paula J. Dobriansky had served as a member of the Board since May 2010. Ms Dobriansky's resignation letter is included as Exhibit 99.3 to this Current Report.

On September 8, 2010:

Ms. Naoko Hatakeyama tendered her resignation from the Board effective immediately. Ms. Hatakeyama had served as a member of the Board since May 2010. Ms. Hatakeyama's resignation letter is included as Exhibit 99.4 to this Current Report; and

Mr. Xiqing Diao tendered his resignation from the Board effective immediately in an effort to maintain a majority of independent directors on the Board to stay in compliance with relevant listing standards. Mr. Diao had served as a member of the Board since November 2005, and will remain with the Company as its new Chief Executive Officer as described in more detail below.

The circumstances representing the disagreement that caused the resignation of the above Directors, if any, are provided in their respective resignation letters, if applicable, which are incorporated herein by reference in their entirety.

\* \* \*

Following the decision to dismiss Deloitte as the independent registered public accounting firm of the Company:

On September 6, 2010, Mr. William D. Suh tendered his resignation from the position of Chief Financial Officer of the Company effective immediately. Mr. Suh had served as the Chief Financial Officer of the Company since October 2008; and

On September 8, 2010, Mr. Christopher Patrick Holbert tendered his resignation from the position of Chief Executive Officer of the Company effective September 8, 2010 18:00 p.m. Beijing Time. Mr. Holbert had served as the Chief Executive Officer of the Company since August 2009.

(Emphasis added).

37.     Attached to the Form 8-K were letters of resignation by Zhang, Dobriansky, and

Hatakeyama. Zhang's resignation letter stated:

Dear Mr. Chairman and the follow directors of the Board:

Subject: My resignation as Company Audit Committee (AC) Chairman and Independent Director with immediate effect.

It has been almost one year since DY listed in the NYSE. I have to say that working closely with the Chairman, CEO and CFO of the company has been a great pleasure for me.

From roughly one month ago, I got the phone call from Frank Li, the Audit Partner of Deloiite (DT) [*sic*] to express concerns to the Audit Committee over several financial irregularities and management control weakness.  After hearing the full story, I immediately called an AC meeting and upon receiving unanimous approval from the AC as a well as support from the Chairman, the AC immediately engaged Latham Watkins, the US Law Firm, to handle the independent investigation not only to report back to the AC, but also as a part of the audit process requested by DT to give an opinion to the 2010 DY company financials. As our Chairman put it in the board meeting just now that maybe due to the cross culture differences between US style work and maybe because of the second tier management don't fully understand the US listing requirements, the investigation has not progressed in the last month. This delay could potentially render the company not filing its annual financial statements on time to the SEC.

In the past week, the Management has suggested to change the auditors of the company from DT to Frazer Frost (FF) who was the company prior auditors.  This proposal has just been resolved in the full board meeting and Full AC meeting with voting taking place of 4 against 3 in favor and 2 against 1 in favor.

As the AC chairman and independent Director of the company, I respect the company democratic decision process as stipulated by the company Memorandum and Articles of Association. However, as a qualified UK Chartered Accountant and a trained Professional, I have brought to the attention of the board the following potential risks related to the change of auditors. These risks can be summarized as follows:

    1.  FF has not yet signed engagement letter with the company which is a risk to the company.

    2.  Change of auditors during the investigation process could potentially lead to further investigation from the SEC.

    3.  To change from a Big4 audit firm to a non-Big4 could have very negative impact in the investment community in terms of corporate

governance thus lead to potential share price drop and subsequent US class law suit.

4. Even the Company US counsel has indicated in the meeting against change of auditors at this particular time frame.

Based on the reasoning stated above and the disagreement with the Board decision, I have no choice but to resign from the Company with Immediate Effect as both the AC Chairman and Independent Director.

I wish the company very best of luck and hope all the remaining directors to perform its duties to not only help the company to build its commercial success, but also to strengthen its compliance and corporate governance as a US listed company.

Best Regards,
/s/ James Zhang
James Zhang

38.   Dobriansky's resignation letter stated:

Dear Mr. Guo:

I am writing to inform you of my resignation from the board of Duoyuan Printing.

During the September 6 Board telephone call regarding the ongoing audit of Duoyuan Printing, I indicated my position that the company should address all allegations directly and expeditiously. This would require providing the necessary information solicited and continued usage of the same firm conducting the current audit. As I stated, not to stay the course in the middle of this investigation is quite problematic.

As a board member who believes that transparency is essential to the fabric of any company, I expressed concern about this particular matter and would have liked to have seen an immediate resolution. Not to do so, I believe, impacts on the company's fundamental corporate governance. This is a troubling circumstance for me. Unfortunately, given the outcome of the recent phone call, I do not find that my board participation in Duoyuan Printing can continue.

Sincerely,
/s/ Paula J. Dobriansky
Paula J. Dobriansky

39.     As a result of the resignations, Diao was appointed CEO; Sun was appointed as

CFO; Liu was appointed COO; and Cai was appointed Chairman of the Audit Committee.

40.     The Company's announcements of September 13, 2010 had an immediate and

dramatic effect on the price of Duoyuan's stock, which plummeted 40%, from $4.95 to $2.99, on

September 13, 2010.

41.     On March 18, 2011, the Company filed with the SEC a Form 8-K reporting,

among other things:

> Following the dismissal of Deloitte, the Company has been unable to
> fulfill its obligations to file its Annual Report on Form 10-K for the year
> ended June 30, 2010 and subsequent Quarterly Reports on Form 10-Q for
> the quarters ended September 30 and December 31, 2010.
>
> * * *
>
> In November 2010, the staff of the U.S. Securities and Exchange
> Commission ("SEC") notified the Company that, on October 7, 2010, the
> SEC initiated a formal investigation into whether the Company had
> engaged in fraud in the sale of securities, had filed materially false
> documents with the SEC, had failed to maintain adequate books and
> records, and had failed to maintain an adequate system of internal
> accounting controls, and whether the Company's principal officers had
> made false certifications regarding the Company's financial statements,
> and had engaged in deceit in dealings with the Company's external
> auditor. On November 10, 2010, the SEC served the Company a subpoena
> for documents relating to the Company's termination of Deloitte, the
> Company's revenues and costs generally, and the Company's relationship
> with Duoyuan Global Water, Inc.

42.     On this news, the Company's stock price fell approximately 24%, from $2.08 to

$1.59 on March 18, 2011.

43.     As of the filing of this Complaint, Duoyuan has not retained a new independent

auditor, has not filed a Form 10-K for the fiscal year ended June 30, 2010, and has not filed Form

10-Qs for the quarters ended September 30, 2010, December 31, 2010, and March 31, 2011.

44.     Furthermore, in violation of Wyo. Stat. § 17-16-701(a), Duoyuan has not held an

annual meeting of shareholders since October 15, 2009, more than 17 months ago.

## DERIVATIVE AND DEMAND ALLEGATIONS

45.     Plaintiffs bring Count I of this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

46.     Plaintiffs will adequately and fairly represent the interests of Duoyuan and its shareholders in enforcing and prosecuting its rights.

47.     Plaintiffs are owners of Duoyuan common stock and were owners of Duoyuan common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

48.     On December 14, 2010, more than 90 days ago, in accordance with Wyo. Stat. § 17-16-742, Plaintiffs made a demand (the "Demand") on the Board to commence an action against certain directors and executive officers of Duoyuan. A copy of Plaintiff's Demand is attached hereto as Exhibit A.

49.     On December 23, 2010, Plaintiffs' counsel received from defendant Guo the following email, which was not specifically responsive to the Demand but rather appeared to be a "form" response:

> Dear Mr. Zagar,
>
> I have received your letter. Thank you very much for your concern and support to our company. We will definitely take actions to solve the problems and give all shareholders a satisfying reply.
>
> Best regards,
>
> Wenhua Guo

50.     As of the filing of this Complaint, beyond the non-responsive form email set forth above, Plaintiffs have received no response to the Demand. Indeed, it appears that the Board has completely ignored the Demand.

-19-

## CLASS ACTION ALLEGATIONS

51. Plaintiffs bring Count II of this action on their own behalves and as a class action on behalf of all Class members, as defined herein.

52. The "Class" consists of all persons who held Duoyuan common stock on the date of filing this Complaint. Excluded from the Class are defendants and their respective families, subsidiaries, affiliates, and successors.

53. Membership in the Class is so numerous as to make joinder of all Class members impracticable. There are millions of shares of Duoyuan common stock outstanding. The disposition of the Class' claims in a class action will provide substantial benefits to the parties in Court.

54. There are numerous and substantial questions of law and fact common to all members of the Class which control this litigation and which predominate over any individual issues. The common questions of law and fact include:

      a.     whether the defendants violated Wyoming law as alleged herein; and

      b.     whether the relief requested herein on behalf of the Class should be granted.

55. The claims of Plaintiffs are typical of the claims of the Class and Plaintiffs have no interest adverse to the interests of the other members of the Class.

56. A class action is superior to other methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

      a.     the prosecution of separate actions would create a risk of inconsistent or varying adjudications;

      b.     the defendants have acted on grounds generally applicable to the Class;

-20-

c.  because of the complexity of the issues involved in this litigation, the size of the individual Class members' claims, and the limited resources of the Class members, few, if any, Class members could afford to seek legal redress individually for the wrongs the defendants committed;

d.  this action will cause an orderly and expeditious administration of the Class' claims, and will foster economies of time, effort and expenses;

e.  when the liability of the defendants has been adjudicated, claims of all members of the Class can be determined by the Court; and

f.  this action presents no difficulty that would impede its management by the Court as a class action and is best available means by which Plaintiffs and other members of the Class can seek redress for the harm caused by the defendants.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

57.  Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

58.  Plaintiffs bring this Count I against the Individual Defendants derivatively on behalf of Duoyuan.

59.  As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial and operational statements were prepared and presented in such a fashion so as not to be misleading, and, when put on notice of problems with the Company's lack of adequate internal and financial controls, to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

60.  During the relevant period, the Individual Defendants received numerous reports regarding problems with the Company's lack of adequate internal and financial controls and its problematic accounting and financial reporting practices and procedures.  Through their

-21-

attendance at Board, Audit Committee and management meetings; their review of the Company's financial statements; and conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that Duoyuan lacked adequate internal and financial controls and that its publicly reported financial statements were false and misleading.

61.     As alleged herein, the Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly engaging in improper financial reporting and accounting practices, knowingly disseminating false and misleading financial statements, and knowingly maintaining inadequate internal controls.

62.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with investigations of the Company and its improper financial reporting and accounting practices.

## COUNT II

### Against the Director Defendants for Violation of Wyoming Law

63.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

64.     Plaintiffs bring this Count II against the Director Defendants individually and on behalf of the Class.

65.     Pursuant to Wyo. Stat. § 17-16-701(a), "a corporation shall hold a meeting of shareholders annually. . . ."

66.     Duoyuan's last annual meeting was held on October 15, 2009, more than 17 months ago.

-22-

67.    In violation of Wyo. Stat. § 17-16-701(a), the Director Defendants have failed to schedule, provide notice of, or hold an annual meeting for 2010.

68.    To remedy the Director Defendants' foregoing violation of Wyoming law, the Court should issue an Order requiring the Director Defendants within ten (10) days to: (i) schedule an annual meeting of Duoyuan's shareholders to be held no later than thirty (30) days from the date of the Order; and (ii) provide to Duoyuan's shareholders notice of the annual meeting in accordance with Duoyuan's bylaws.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Issuance of an Order requiring the Director Defendants within ten (10) days to: (i) schedule an annual meeting of Duoyuan's shareholders to be held no later than thirty (30) days from the date of the Order; and (ii) provide to Duoyuan's shareholders notice of the annual meeting in accordance with Duoyuan's bylaws

C.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: April 27, 2011                                    Respectfully submitted,

**TERRY W. MACKEY, P.C.**

-23-

Terfy W. Mackey
114 East 21st Street
Cheyenne, WY 82001
Telephone: (307) 635-7517
Facsimile: (307) 635-7565

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Richard Kim
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Attorneys for Plaintiffs*